UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | )   No. 1:03-cv-04087 (DLC) |
| PAUL A. ALLAIRE, G. RICHARD THOMAN, | ) |
| BARRY D. ROMERIL, PHILIP D. FISHBACH, | ) |
| DANIEL S. MARCHIBRODA, AND GREGORY B. | ) |
| TAYLOR | ) |
| | ) |
| Defendants. | ) |
| | ) |

MEMORANDUM IN OPPOSITION TO MOTION FOR RELIEF FROM JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................i

INTRODUCTION ......................................................................................................................1

BACKGROUND ........................................................................................................................2

    A.   When the Commission agrees to settle a case without requiring the defendant to admit wrongdoing, the defendant must agree not to publicly deny the Commission's allegations against them. ..................................................................................................2

    B.   In 2003, Romeril entered into a consent judgment, which included a no-deny provision, to resolve an enforcement action arising from a multibillion dollar accounting fraud. ......................................................................................................3

    C.   Romeril now seeks partial relief from the judgment...........................................6

ARGUMENT............................................................................................................................6

    I.   Romeril is not entitled to relief under Rule 60(b)(4) because he cannot demonstrate that the consent judgment is "void."...........................................................................6

    II.   Romeril waived his First Amendment rights when he consented to the judgment. .................9

        A.   Romeril agreed to the no-deny provision and waived any right to publicly deny the allegations against him. ..................................................................................9

        B.   Romeril offers no legitimate justification for disregarding his waiver....................12

    III.   The no-deny provision is consistent with the First Amendment............................18

        A.   The government, and the judiciary, have a compelling interest in not permitting the denial of allegations following the entry of consent judgments............................19

        B.   The no-deny provision is narrowly tailored to serve these important interests....................23

CONCLUSION.......................................................................................................................25

**INTRODUCTION**

In 2003, Barry Romeril settled an enforcement action that the Securities and Exchange Commission brought against him.  Romeril was the Chief Financial Officer of Xerox, a major public corporation, and he was charged as a central figure in a multibillion dollar accounting fraud involving Xerox.  Romeril did not have to offer to settle—he could have contested the allegations against him at trial.  But Romeril opted to negotiate a settlement, which allowed him to avoid the cost of trial without admitting wrongdoing, eliminate the risk of an adverse verdict, and obtain certainty regarding the relief against him.  In exchange, he accepted obligations in a consent he signed, which was incorporated into a judgment entered by this Court.

Among other things, Romeril agreed that he would not publicly deny the allegations in the complaint.  This provision appears in the consent in connection with a 1972 Commission policy, pursuant to which the Commission will accept a settlement only if the defendant agrees to such a no-deny provision.  Compelling reasons support that policy: denials of allegations following entry of a consent judgment undermine the authority of the Court that approved it, undercut the factual basis for the action and the relief obtained, and create confusion for investors and the market.

Romeril enjoyed the fruits of the settlement for 16 years; no trial was ever held.  But now he asks to be relieved of the obligations to which he agreed, contending that the no-deny provision violates the First Amendment.  Romeril's belated invocation of constitutional rights, which he knowingly and intentionally waived, cannot mask the unfairness of his belated attempt to undermine the judgment to which he consented, as well as the integrity of the settlement process.

Before even reaching any constitutional arguments, the Court should deny Romeril's motion on procedural grounds because the consent judgment is not void for want of jurisdiction or lack of due process, which are the only grounds justifying the rare grant of relief under Rule 60(b)(4).  This

Court undisputedly has jurisdiction, as Romeril admitted in 2003 and continues to admit now, and Romeril does not point to any lack of due process.

Apart from the procedural defect, Romeril's constitutional challenge fails for two other reasons. Romeril waived any First Amendment rights when he signed the consent. It is well-settled that defendants involved in litigation with the government may waive their constitutional rights, including their speech rights, as part of a judicially approved settlement. Romeril gave up his right to publicly deny the Commission's allegations when he decided to avoid the costs and risks of trial, and there is no legitimate justification for disregarding his voluntary and knowing waiver.

And even if this Court could somehow look past his waiver, the no-deny provision is constitutional. It serves the compelling public interests in: not undermining the factual bases for the Commission's action, which have a deterrent and informative effect; ensuring that judicial approval of a consent judgment is not undermined by a subsequent denial; and promoting the strong public policy favoring settlements, which conserve resources. Importantly, the no-deny provision is narrowly tailored in scope, as it restricts only certain public denials of allegations that would undercut these interests. It is also tailored in terms of the remedy it provides if there is a breach—the consequence for the defendant is the potential loss of the settlement.

## BACKGROUND

**A. When the Commission agrees to settle a case without requiring the defendant to admit wrongdoing, the defendant must agree not to publicly deny the Commission's allegations against the defendant.**

The Commission resolves the majority of its enforcement actions by entering into consent judgments, which are "compromises in which the parties give up something they might have won in litigation and waive their rights to litigation." *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 235 (1975). Consent judgments have "attributes both of contracts and of judicial decrees." *Id.* at 236 n.10. They resemble contracts because they "are entered into by parties to a case after careful

negotiation has produced agreement on their precise terms." *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971). They are judicial decrees because, unlike private settlements, the agreed-upon terms are memorialized in a judicial order over which a court usually retains jurisdiction. *Id.*

In 1972, the Commission issued a policy regarding settlements. The policy addressed a problem of defendants denying allegations after settling without admitting wrongdoing. The Commission announced that it would not agree to a settlement that would "permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceedings." 37 FED. REG. 25224 (Nov. 29, 1972), codified at 17 C.F.R. 202.5(e). The policy was intended "to avoid creating, or permitting to be created, an impression that a decree is being entered or a sanction imposed, when the conduct alleged did not, in fact, occur." *Id.* The policy, which is directed at Commission staff, does not impose obligations on litigants unless they elect to be bound—they can decide not to settle and litigate the case. But the policy clarifies that if a litigant wishes to propose a settlement without admitting wrongdoing, the Commission will not agree to terms that allow a public denial of the allegations.

**B.  In 2003, Romeril entered into a consent judgment, which included a no-deny provision, to resolve an enforcement action arising from a multibillion dollar accounting fraud.**

The consent judgment arises from a Commission complaint claiming that Xerox engaged in a fraudulent scheme to mislead investors about its earnings in order to inflate the price of the company's publicly traded shares. Dkt. No. 1, Compl. ¶ 1 (Jun. 5, 2003). As alleged in the complaint, the use of improper accounting artificially boosted revenues and earnings, which allowed Xerox to increase its pre-tax earnings by nearly $1.4 billion in its 1997-2000 financial results. *Id.* at ¶¶ 1-6, 20. By 1998, up to 37% of Xerox's pre-tax earnings came from undisclosed changes to accounting practices. *Id.* ¶ 2.

The Commission brought an enforcement action against six Xerox executives, including Romeril, who was its Chief Financial Officer. *Id.* ¶ 15. According to the complaint, Romeril was responsible for the filing of quarterly and annual reports that contained materially false and misleading financial information. *Id.* ¶ 16. The Commission alleged that Romeril helped create a "tone at the top" that drove the knowing and reckless distortion of Xerox's true financial performance, which misled investors. *Id.* ¶¶ 20-36. During the relevant time period, Romeril was paid over $2.5 million in salary and bonuses, a portion of which was tied to meeting financial targets, and he realized approximately $2.8 million in profits from the sale of Xerox stock that was attributable to the fraud. *Id.* ¶ 16. The Commission alleged that Romeril violated, among other statutes, Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5.

Romeril, who was represented by experienced securities counsel, including a former Director of the Division of Enforcement and a future Acting General Counsel of the Commission, elected to settle rather than litigate the case. Dkt. No. 4, Consent (Jun. 13, 2003). In the consent that he signed, he admitted "the Court's jurisdiction over [him] and over the subject matter of this action." *Id.* ¶ 1 (Consent). "Without admitting or denying the allegations of the complaint (except as to personal and subject matter jurisdiction)," he agreed to be enjoined from violating specific securities laws, to pay disgorgement and prejudgment interest of approximately $4.2 million, to pay a civil penalty of $1 million, and to be subject to an officer/director bar. *Id.* ¶ 2.

Romeril represented that he entered "into this Consent voluntarily" and that "no threats, offers, promises, or inducement of any kind have been made by the Commission or any member, officer, employee, agent, or representative of the Commission to induce Defendant to enter into this Consent." *Id.* ¶ 6. He waived "the entry of findings of fact and conclusions of law," as well as "the right, if any, to appeal from the entry" of final judgment. *Id.* ¶¶ 4-5. He agreed that the consent

"shall be incorporated in the Final Judgment" and that the "Court shall retain jurisdiction over this matter for purpose of enforcing the terms of the Final Judgment." *Id.* ¶¶ 7, 15.

Romeril also agreed to a no-deny provision, in which he stated that he "understands and agrees to comply with the Commission's policy 'not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegation in the complaint or order for proceedings,' 17 C.F.R. § 202.5." *Id.* ¶ 11. Romeril agreed "not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis." *Id.* The provision states that if Romeril "breaches this agreement, the Commission may petition the Court to vacate the Final Judgment and restore this action to its active docket." *Id.* The provision did not affect Romeril's "testimonial obligations" or his "right to take legal or factual positions in litigation in which the Commission is not a party." *Id.*

The Court entered a final judgment against Romeril in June 2003, which incorporated the consent. Dkt. No. 4, Judgment (Jun. 13, 2003). The judgment reflects that Romeril "consented to the Court's jurisdiction" over him," the "subject matter of this action," and "entry of this Final Judgment without admitting or denying the allegations of the Complaint (except as to jurisdiction, which is admitted)." *Id.* at 1. It imposes the agreed-upon injunctive and monetary relief, requires Romeril to "comply with all of the undertakings and agreements set forth" in the consent, and provides that "this Court shall retain jurisdiction of this matter for purposes of enforcing the terms of this Final Judgment." *Id.* at 1-5.

The ramifications of the Xerox fraud were significant. The Commission brought a separate action against Xerox, and the resulting consent judgment required Xerox to restate its financial results and pay a $10 million penalty, which at the time was the largest corporate penalty imposed in a Commission enforcement action. *SEC v. Xerox*, No. 02-cv-2780 (DLC), Dkt. No. 2 (S.D.N.Y.

May 3, 2002); James Bandler, *Xerox Will Pay $10 Million Penalty to Settle SEC Accounting Charges*, Wall.

St. J., Apr. 2, 2002.  Xerox's fraud reverberated in Congress, whose members cited it when debating

the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204.  *See* Cong. Rec. H1550 (Apr. 24, 2002) (Rep.

Bentsen) ("[T]he restatements at Xerox, Sunbeam and others are part of the corporate excesses that

have occurred as a result of the exuberant nineties."); *id.* at H1586 (Rep. Dingell).  The six

executives, including Romeril, settled for a total of $22 million.  Dkt. Nos. 4-9; Litig. Rel. No. 18174

(Jun. 5, 2003), https://www.sec.gov/litigation/litreleases/lr18174.htm.  The Commission later

entered into a consent judgment with KPMG, Xerox's outside auditor, which agreed to pay $22.475

million in disgorgement, interest, and penalties.  *SEC v. KPMG*, No., 03-cv-671, Dkt. No. 101 (Apr.

20, 2005).

### C.  Romeril now seeks partial relief from the judgment.

Sixteen years after voluntarily agreeing to be bound by the consent judgment, Romeril seeks

partial relief from it under Federal Rule of Civil Procedure 60(b)(4).  Dkt. No. 23-24 (May 6, 2019).

Romeril does not seek to vacate the entire consent judgment; rather, he proposes that an amended

consent "be substituted" as an exhibit to the judgment entered in 2003.  Dkt. No. 23, at 1 & Ex. A.

The only significant difference between the original consent and the proposed amendment is the

elimination of the no-deny provision at paragraph 11 of the original.  *Id.*

## ARGUMENT

### I.    Romeril is not entitled to relief under Rule 60(b)(4) because he cannot demonstrate that the consent judgment is "void."

A Rule 60(b) motion "is generally not favored and is properly granted only upon a showing

of exceptional circumstances" by the "party seeking relief from judgment," who bears "the burden

of proof" that the judgment is void.  *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 391 (2d Cir.

2001).  Relief under Rule 60(b)(4) is warranted "only in the rare instance where a judgment is

premised either on a certain type of jurisdictional error or on a violation of due process that deprives

a party of notice or the opportunity to be heard." *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 271 (2010); *Congregation Mischknois Lavier Yakov, Inc. v. Bd. of Trs. for Vill. of Airmont*, 301 F. Appx. 14, 15 (2d Cir. 2008) (rejecting argument that a consent judgment was void because the settlement supposedly violated substantive law).  "[A] lack of subject-matter jurisdiction for the purpose of making a judgment void means a court's lack of jurisdiction over an entire category of cases, not whether a court makes a proper or improper determination of subject-matter jurisdiction in a particular case."  12 MOORE'S FEDERAL PRACTICE, Civil 60.44 (2019).  Relief is available only "for the exceptional case in which the court that rendered judgment lacked even an 'arguable basis' for jurisdiction." *United Student Aid*, 559 U.S. at 271; *Nemaizer v. Baker*, 793 F.2d 58, 65 (2d Cir. 1986) (requiring "a clear usurpation of power by a district court," namely "'total want of jurisdiction'").

This is not a "rare" or "exceptional case," *id.*, in large part because there is no dispute about jurisdiction.  This Court properly exercised subject matter jurisdiction pursuant to 15 U.S.C. 78u(d) and 78aa, as well as 28 U.S.C. 1331, and Romeril never challenged personal jurisdiction.  Dkt. No. 1, Compl. ¶¶ 8, 15.  To the contrary, he consented "to the Court's jurisdiction over [him] and the subject matter of this action" and admitted the allegations "as to jurisdiction."  Dkt. No. 4 (Judgment at 1; Consent at 1) (Romeril "admits the Court's jurisdiction over Defendant and over the subject matter of this action").  These jurisdictional determinations, embodied in the judgment, are "binding" because Romeril "had an opportunity to contest subject-matter jurisdiction and failed to do so."  11 Wright & Miller, FED. PRAC. & PROC. 2862 (3d ed. 2019), citing *Nemaizer*, 793 F.2d at 65.  Even in the amended consent that Romeril asks this Court to enter, he continues to "admit the Court's jurisdiction over [him] and over the subject matter of this action."  Dkt. No. 23, Ex. A, ¶ 1.  Because there is no question of jurisdiction, relief under Rule 60(b)(4) is not available.  *Northeast Ohio Coalition for the Homeless v. Husted*, 696 F.3d 580, 601 (6th Cir. 2012) (rejecting Rule 60(b)(4) challenge to a consent judgment where no jurisdictional defect or due process violation was alleged or shown).

The presence of a First Amendment argument does not alter the analysis.  In *United States v. Berke*, a defendant "waived his First Amendment rights in connection with the entry of a consent decree" and then later filed a Rule 60(b)(4) motion to void the consent judgment on First Amendment grounds.  170 F.3d 882, 883 (9th Cir. 1999).  The court held that because the defendant "did not claim that there was any infirmity in the jurisdiction of the court that entered the consent decree," the consent decree was "not 'void' within the meaning of Rule 60(b)(4)."  *Id.* at 884.

The decision in *Crosby v. Bradstreet Co.*, 312 F.2d 483 (2d Cir. 1963), does not suggest a different result.  *Crosby* involved a 30-year-old injunction against libel that restrained a credit reporting company from publishing any information about two brothers.  *Id.* at 484-85.  The Second Circuit vacated the injunction, but the case is distinguishable.  The Court applied the common-law rule that equity courts lack jurisdiction to enjoin libel.  *Id.* at 485, citing *American Malting Co. v. Keitel*, 209 F. 351, 353-58 (2d Cir. 1913) ("[C]ourts of equity have no jurisdiction to restrain the publication of a libel" because the only remedy for libel is an action for damages); *Metro. Opera Ass'n v. Local 100, Hotel Emples. & Rest. Emples. Int'l Union*, 239 F.3d 172, 177 (2d Cir. 2001) (citing *Crosby* and *American Malting* as examples of how, "for almost a century[,] the Second Circuit has subscribed to the majority view that, absent extraordinary circumstances, injunctions should not ordinarily issue in defamation cases").[1]  That rule is not applicable to this case, which does not involve libel.  Rather, this Court has jurisdiction over "all suits in equity and at law brought to enforce" the securities laws, 15 U.S.C. 78aa, a point Romeril has never disputed.

Romeril also does not identify a "violation of due process" that would justify granting relief under Rule 60(b)(4).  *United Student Aid Funds*, 559 U.S. at 271.  Romeril had an opportunity to litigate the case to verdict if he desired, but instead negotiated a settlement, memorialized in a

---

[1] The injunction in *Crosby* was extremely broad—it enjoined "publication of information about a person, without regard to truth, falsity, or defamatory character of that information."  312 F.2d at 485.  Thus, the injunction was not limited to certain types of information.  In contrast, the no-deny provision is limited to public denials of allegations in the complaint.

consent judgment, in which he agreed to the no-deny provision and the Court's continuing jurisdiction.  Dkt. No. 4 (Judgment at 1; Consent at 1).

## II.     Romeril waived his First Amendment rights when he consented to the judgment.

Romeril cannot use a Rule 60(b)(4) motion to raise his First Amendment objections, but even if his arguments were properly before this Court, they lack merit because Romeril waived any First Amendment rights he had when he signed the consent and there is no justification for disregarding that waiver.

### A.  Romeril agreed to the no-deny provision and waived any right to publicly deny the allegations against him.

Barely mentioned by Romeril in his motion is the fact that he agreed to the no-deny provision.  Romeril did not have to negotiate a settlement and he did not have to sign the consent— he could have proceeded with the litigation.  There is a dispositive constitutional difference between an agreement to be silent and a restraint imposed against the will of the silenced party.

Just as it is "settled that plea bargaining does not violate the Constitution even though a guilty plea waives important constitutional rights," it is settled that defendants can waive their constitutional rights in other agreements to end litigation.  *Town of Newton v. Rumery*, 480 U.S. 386, 393 (1987); *see also D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 184-87 (1972) (stating that due process rights "are subject to waiver").  "Courts have routinely enforced voluntary agreements with the government in which citizens have, for example, given up the right to sue through releases and covenants not to sue the government, *see Rumery*, 480 U.S. at 397-98; the right to speak regarding government secrets through confidentiality agreements, *see Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980) (per curiam); [and] the right to a jury trial through agreements to submit litigable disputes exclusively to arbitration, *see AT&T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648-49 (1986)."  *Lake James Cmty. Volunteer Fire Dep't v. Burke Cty.*, 149 F.3d 277, 280 (4th Cir. 1998).  Like those who enter into guilty pleas, judicially enforced settlements, and contracts with state actors,

defendants in civil law-enforcement actions can relinquish constitutional protections in a consent judgment. *E.g.*, *INS v. St. Cyr*, 533 U.S. 289, 322 (2001); *Leonard v. Clark*, 12 F.3d 885, 889 (9th Cir. 1993); *Paragould Cablevision, Inc. v. City of Paragould*, 930 F.2d 1310, 1315 (8th Cir. 1991); *Erie Telecomms. v. City of Erie*, 853 F.2d 1084, 1096 (3d Cir. 1988).

Courts have recognized that First Amendment rights may be waived as part of a settlement. *See Intermor v. Inc. Vill. of Malverne*, 2007 U.S. Dist. Lexis 57928, at *22 (E.D.N.Y. Aug. 8, 2007) (citing *Curtis Publ'g Co. v. Butts,* 388 U.S. 130, 145 (1967) for the proposition that First Amendment rights may be waived); *Leonard*, 12 F.3d at 889 ("The Supreme Court has held that First Amendment rights may be waived upon clear and convincing evidence that the waiver is knowing, voluntary, and intelligent."). The Second Circuit rejected a challenge to a consent decree provision involving the publication of union campaign literature, holding that even if the provision encroached upon First Amendment rights against compelled speech, the union waived any objection by consenting. *United States v. Int'l Bhd. of Teamsters*, 931 F.2d 177, 187-88 (2d Cir. 1991). The Third Circuit declined to vacate a consent decree signed by two political parties when one party argued that the judgment was an unconstitutional prior restraint against political speech because the Court held that the party "voluntarily agreed" to "abide by the very provisions that it now challenges as unconstitutional." *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192, 205 (3d Cir. 2012). The Ninth Circuit enforced a consent decree in which the parties agreed to a non-disparagement clause, rejecting the argument that the provision unconstitutionally restricted the right to petition, namely the filing of safety reports. *Malem Med., Ltd. v. Theos Med. Sys.*, 2019 U.S. App. Lexis 4790, at *3 (9th Cir. Feb. 19, 2019). And the Fourth Circuit enforced a waiver of First Amendment rights in a government contract that affected the right to petition. *Lake James*, 149 F.3d at 280-82. "One who has been a party to a proceeding wherein a consent decree has been entered and who has been a party to that consent, is in no position to claim that such decree restricts his freedom of speech. He has waived

his right and given his consent to its limitations within the scope of that decree." *In re George F. Nord Bldg. Corp.*, 129 F.2d 173, 176 (7th Cir. 1942).

Romeril agreed to waive numerous rights when he settled. He agreed "not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint." Dkt. No. 4, Consent ¶ 11. He also relinquished his right to a trial and to appeal. *See* Consent, Dkt. No. 4, Consent ¶¶ 4-5; *see Armour*, 402 U.S. at 682 ("Because the defendant has, by the decree, waived his right to litigate the issues raised, a right guaranteed to him by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written."). Romeril agreed in 2003, when he was the CFO of Xerox and was represented by experienced counsel, that he waived these rights "voluntarily" and that no "threats, offers, promises, or inducements of any kind have been made by the Commission" or its staff. *Id.* He does not suggest now that his waiver was not voluntary and knowing.

The Commission's position on no-deny provisions would have been clear to Romeril before he made a settlement offer to the Commission—announcing that position was Rule 202.5(e)'s purpose. 37 FED. REG. at 25224. If Romeril wanted to deny the Commission's allegations against him, he did not have to accept the benefits that accrue to defendants from compromise— defendants like Romeril are "permitted to settle the complaint against them without admitting or denying the SEC's allegations and they often seek and receive concessions concerning the violations to be alleged in the complaint, the language and factual allegations in the complaint, and the collateral, administrative consequences of the consent decree." *SEC v. Clifton*, 700 F.2d 744, 748 (D.C. Cir. 1983). But Romeril signed the consent, which was memorialized in a judgment that has remained in effect for 16 years without any stated objection. If Romeril "felt that [his] First Amendment rights were burdened" by the no-deny provision, he "should not have bargained them away and signed the agreement." *Leonard*, 12 F.3d at 889-90. The "forum for protecting [his] free

speech rights was the bargaining table, not the courtroom" more than a decade later.  *Paragould Cablevision*, 930 F.2d at 1315.

> **B.  Romeril offers no legitimate justification for disregarding his waiver.**

1. Romeril's waiver should be enforced because "the interest in its enforcement" is not "outweighed in the circumstances by a public policy harmed by enforcement."  *Rumery*, 480 U.S. at 392.  In *Rumery*, an individual released Section 1983 claims against public officials in exchange for dismissal of criminal charges against him.  *Id.* at 390.  The Court enforced this agreement even as it acknowledged that defendants often "are required to make difficult choices that effectively waive constitutional rights."  *Id.* at 393.  The agreement, the Court held, reflected "a highly rational judgment that the certain benefits of escaping prosecution exceed the speculative benefits of prevailing in a civil action," particularly when "the benefits of the agreement to Rumery are obvious: he gained immunity from criminal prosecution in consideration of abandoning a civil suit that he may well have lost."  *Id.* at 394.

*Rumery*'s analysis should guide this Court.  Romeril and the Commission entered into the consent judgment "after careful negotiation ha[d] produced agreement on [its] precise terms."  *United States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971).  Both sides waived "their right to litigate the issues," saving "themselves the time, expense, and inevitable risk of litigation," and, "in exchange for the saving of cost and elimination of risk," both sides gave "up something they might have won had they proceeded with the litigation."  *Id.*; *SEC v. Citigroup Global Mkts.*, 752 F.3d 285, 295-96 (2d Cir. 2014).  Romeril avoided the risks and expense of trial, as well as the collateral estoppel effect of an adverse verdict on private litigation, "in consideration of abandoning" his ability to deny the allegations in the complaint.  *Rumery*, 480 U.S. at 394.  The Commission, in turn, gave "up a number of advantages," "including the filing of findings of fact and court opinions clearly setting forth the reasons for the result" in Romeril's case.  *Clifton*, 700 F.2d at 748.

For consent judgments to remain viable tools for agencies and courts, the compromise "must be respected." *Armour*, 402 U.S. at 682. "Once the judgment consented to has been entered as the judgment of the court, the court is by and large required to honor the terms agreed to by the defendant." *SEC v. Levine*, 881 F.2d 1165, 1181 (2d Cir. 1989); *accord Miller v. SEC*, 998 F.2d 62, 65 (2d Cir. 1993) ("If sanctioned parties easily are able to reopen consent decrees years later, the SEC would have little incentive to enter into such agreements."). "Long standing precedent evinces a strong public policy against judicial rewriting of consent decrees," *Reynolds v. Roberts*, 202 F.3d 1303, 1312 (11th Cir. 2000), and "a district court may not impose obligations on a party that are not unambiguously mandated by the decree itself," *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir.1995). Thus, consent judgments "should be strictly construed to preserve the bargained for position of the parties," *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983), and courts are "reluctant to upset this balance of advantages and disadvantages and require the dissolution of such consent decrees years after they were originally entered" when it is not "clearly inequitable for the decree to continue in effect." *Clifton*, 700 F.2d at 748.

"[S]ignificant governmental interests would be impaired if courts too readily lifted" a consent decree "after a few years of compliance," let alone after 16 years. *Id.* Romeril complains about "perpetually mandated silence," Br. 8, but he agreed to this silence and remained silent about his silence for over a decade. Upholding the provision precludes Romeril from enjoying the benefits of the settlement without adhering to its obligations, which is consistent with public policy. *Erie Telecomms.*, 853 F.2d at 1097 (declining to permit a party "to withdraw from performing its obligations and from discharging its burdens, while it still continues to retain all of the benefits it received from the City as a result of the agreements"). As the Second Circuit stated in an analogous context, allowing "a defendant, who has secured the benefits of a plea agreement and knowingly and voluntarily waived the right to appeal," to then appeal "would render the plea bargaining process

and the resulting agreement meaningless." *United States v. Salcido-Contreras*, 990 F.2d 51, 53 (2d Cir. 1993).

2.      Romeril's four arguments for disregarding his waiver lack merit. *First*, Romeril once more relies on *Crosby*, which is just as distinguishable on the merits as it is procedurally. Br. 5-6. Stanford Crosby, who was in business with his brother Lloyd, brought a libel action against Dun & Bradstreet after it published a credit report stating that both Stanford and Lloyd had been found guilty of criminal fraud, even though Stanford had been acquitted. 312 F.2d at 484. Stanford and Dun & Bradstreet entered into a stipulation that was incorporated into a 1933 order—it was a broad prohibition against Dun & Bradstreet issuing a report about the business activities of either brother. *Id.* Thirty years later, the brothers began competing against each other, and Stanford moved to terminate the order he had previously negotiated after discovering that that he could not obtain credit without credit reports. But Lloyd, a non-party to the original suit, objected. *Id.* at 484. The Second Circuit held that the 1933 "order was void" because the "court was without power to make such an order" and the fact that "the parties may have agreed to it is immaterial." *Id.* at 485.

As discussed above, *supra* at p. 9, *Crosby*'s holding that the 1933 court lacked jurisdiction to enter the order reflected the common-law rule that a court sitting in equity lacked jurisdiction to enjoin a libel. 312 F.2d at 485. *Crosby*'s reference to *Near v. Minnesota*, 283 U.S. 697 (1931), also cited by Romeril (Br. 6), highlights that *Crosby* is concerned with injunctions against future libel. In *Near*, the Court struck down a statute that permitted courts to enjoin publication of defamatory material because of precedent precluding injunctions against the press and because plaintiffs "find their remedies for false accusations in actions under libel laws providing for redress and punishment, and not in proceedings to restrain the publication of newspapers and periodicals." *Id.* at 716, 719. Like *Near*, *Crosby* involved a broad *ex ante* injunction against libel—a form of relief that is not at issue here. Thus, *Crosby* does not concern the issue before the Court, namely the constitutionality of an

14

agreed-to provision in a consent judgment resolving an *ex post* enforcement action concerning alleged violations of federal law.

There are also key factual differences between *Crosby* and this case.  The no-deny provision is not an injunction, but rather is a contractual provision with a specific remedy for breach: "the Commission may petition the Court to vacate the Final Judgment and restore this action to its active docket."  Dkt. No. 4, Consent, ¶ 11; *see United States v. Volvo Powertrain Corp.*, 758 F.3d 330, 343 (D.C. Cir. 2014) ("'[I]f parties to a consent decree wish to cabin the district court's equitable discretion by stipulating the remedies for breach, they are free to do so,' and 'the stipulation will fix the measure of relief to which the victim of a breach is entitled.'"), quoting *Cook v. City of Chicago*, 192 F.3d 693, 698 (7th Cir. 1999).  Moreover, in *Crosby*, the plaintiff that obtained the injunction requested its dissolution, only to be opposed by a non-party to the original proceeding.  Here, the Commission is the plaintiff, it obtained the no-deny provision as part of the consent judgment, and it does not seek to vacate either the no-deny provision or the entire consent judgment.

To the extent *Crosby* could be read to mean that it is irrelevant that a waiver of First Amendment rights was voluntary, it is no longer good law.  It pre-dates cases like *Rumery*, *supra* pp. 9-12, which confirm that a waiver of First Amendment rights is dispositive, not "immaterial." *Crosby*, 312 F.2d at 485.  *Crosby* also pre-dates the numerous cases endorsing the use of consent decrees, which invariably involve waivers of constitutional rights.  *Supra* pp. 12-13.

*Second*, Romeril relies on dicta in a footnote of a vacated opinion (along with out-of-court commentary by the judge who authored it).  Br. 6, 10-12, citing *SEC v. Citigroup Global Markets, Inc.*, 827 F. Supp. 2d 328, 333 n.5 (S.D.N.Y. 2011).  But the issue in *Citigroup* was the lack of admissions—not the presence of a no-deny provision—and the Second Circuit reversed, holding that it was not "within the district court's purview to demand 'cold, hard, solid facts, established either by admissions or by trials,' as to the truth of the allegations in the complaint as a condition for

approving the consent decree." *Citigroup*, 752 F.3d at 295, quoting 827 F. Supp. 2d at 335.  Like the district court in *Citigroup*, Romeril emphasizes the "truth" underlying the allegations, Br. 10-11, 19, but it "is an abuse of discretion to require, as the district court did [in *Citigroup*], that the SEC establish the 'truth' of the allegations against a settling party as a condition for approving the consent decree." *Id.*  Rather than suggest that a no-deny provision was unconstitutional, the Second Circuit stated that "[i]n many cases, setting out the colorable claims, supported by factual averments by the SEC, neither admitted *nor denied* by the wrongdoer, will suffice to allow the district court to conduct its review." *Id.* (emphasis added).

Romeril's concern about implicating the judiciary in "violating the constitution" is misguided.  Br. 19.  A consent judgment is not, as Romeril claims, an application of "judicial power by administrative agencies." *Id.*  Rather, it is a negotiated settlement presented to a court for entry as a judgment if the court finds that it is "fair and reasonable" and the "'public interest would not be disserved.'" *Citigroup*, 673 F.3d at 294, quoting *eBay Inc v. MercExchange*, 547 U.S. 388, 391 (2006).  Courts, including this one, have approved consent judgments with no-deny provisions for decades without any suggestion that a waiver of the ability to publicly deny allegations is unconstitutional.  *E.g., SEC v. Great Am. Techs.*, No. 07-cv-10694 (DLC), Dkt. No. 73 (S.D.N.Y. Nov. 5, 2010); *SEC v. Selterman*, No. 09-cv-06813 (DLC), Dkt. No. 4-7 (S.D.N.Y. Aug. 7, 2009).

*Third*, Romeril contends that the Commission cannot condition settlement "upon the surrender" of First Amendment rights.  Br. 14.  But the unconstitutional conditions analysis becomes relevant only when a person must give up a right to obtain a government benefit, and Romeril does not cite a case that has identified the "ability to settle" as a right or government benefit.  Instead, he cites cases involving conditions imposed upon receipt of federal funds for legal assistance, *Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001), federal funds for libraries, *United States v. Am. Library Ass'n*, 539 U.S. 194 (2003), and land-use permits, *Koontz v. St. Johns River Water*

*Mgmt. Dist.*, 570 U.S. 595 (2013).  Romeril's unconstitutional conditions theory does not work in the

settlement context because consent judgments, which embody compromises, will always condition

the "benefit" of settlement on the relinquishment of rights, including the waiver of the right to a

trial and an appeal.[2]

*Finally*, Romeril incorrectly contends that the Commission lacked the "authority" to

negotiate the no-deny provision, citing Rule 202.5(e).  But the decision whether to settle and what to

settle for "rests squarely with the [Commission], and its decision merits significant deference."

*Citigroup*, 752 F.3d at 296; *Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985); *New York State Dep't of Law

v. FCC*, 984 F.2d 1209, 1213-15 (D.C. Cir. 1993).  In any event, Rule 202.5(e) is not the source of the

Commission's authority to bring or settle an enforcement action—it is a Commission policy that

directs Enforcement attorneys and appears among the "procedures generally followed by the

Commission which have not been formalized in rules." 17 C.F.R. 202.1(c).  Rule 202.5(e) announces

that when the Commission negotiates a consent judgment with a litigant who does not admit

wrongdoing, the Commission will not agree to a settlement that permits a public denial of the

allegations in the complaint.  Rule 202.5(e) does not create any rights for or impose any obligations

on litigants, who can decline to offer to settle.  *See Ass'n of Flight Attendants-CWA v. Huerta*, 785 F.3d

710, 716 (D.C. Cir. 2015) (a policy statement apprises "the regulated community of the agency's

---

[2] As a point of contrast, the Ninth Circuit vacated a settlement in which a plaintiff agreed to release
a Section 1983 claim against a school district in exchange for money and a promise not to seek a
position with the district.  *Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1392-93 (9th Cir.
1991).  The plaintiff was elected to the board for the school district and held in contempt, which the
Ninth Circuit reversed because there was not a "close nexus" between the underlying litigation and
the right waived—the Section 1983 claim had nothing to do with running for elective office.  *Id.* at
1399.  As later cases confirm, where the interest in settling has a nexus with the rights waived, such
as the right to trial or the right to speak on certain topics, the settlement will not be disturbed.
*Leonard*, 12 F.3d at 891-92 (upholding "relatively narrow limitation on the Union's political speech"
agreed to as part of a settlement); *Tollis, Inc. v. Cty. of San Bernardino*, 554 F. App'x 615, 616 (9th Cir.
2014); *Emmert Indus. Corp. v. City of Milwaukie*, 307 F. App'x 65, 67 (9th Cir. 2009).

intentions as well as informing the exercise of discretion by agents and officers in the field")
(internal quotation marks omitted).

### III.    The no-deny provision is consistent with the First Amendment.

Romeril's motion for relief should be denied based on his waiver alone but even if this Court
were to look past his consent, his First Amendment claims lack merit.  A threshold problem is that
Romeril labels the no-deny provision a "gag order" and then relies on cases involving a licensing
scheme, *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990), a preapproval process for artistic
performances, *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975), a law restricting use of
pharmacy records, *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011), and a statute limiting the ability of
criminals to profit from publications related to their crimes, *Simon & Schuster, Inc. v. Members of the
N.Y. State Crime Victims Bd.*, 502 U.S. 105, 117 (1991).  Romeril does not actually cite any cases
involving "gag orders" issued by judges against trial participants, which unlike legislative and
executive actions, necessarily involve judicial review.  *See Southeastern Promotions*, 420 U.S. at 560;
*Freeman v. Maryland*, 380 U.S. 51, 58-59 (1965) (describing the judicial safeguards that are necessary
for a licensing scheme to be constitutional).

Even if the no-deny provision is viewed through the lens of a judicially imposed restriction
on speech against the speaker's will—rather than as a voluntary agreement not to speak—it is
constitutional.  There is "a substantial difference between a restraining order directed against the
press—a form of censorship which the First Amendment sought to abolish from these shores—and
the order here directed solely against trial participants."  *In re Dow Jones & Co.*, 842 F.2d 603, 608 (2d
Cir. 1988) (upholding restraint on trial participant).  Because the no-deny provision binds only
Romeril, it would be reviewed under the "less demanding standard than that established for
regulation of the press."  *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1074 (1991); *Nebraska Press Ass'n
v. Stuart*, 427 U.S. 539, 564-65 (1976) (orders prohibiting extrajudicial commentary of trial

participants are less restrictive than restraints on the press); *United States v. Brown*, 218 F.3d 415, 425 (5th Cir. 2000) ("[G]ag orders on trial participants are evaluated under a less stringent standard than gag orders on the press.").

Reflecting this difference, a judicial restraint on trial participants "is constitutional as long as it is properly justified." *United States v. Morrow*, 2005 U.S. Dist. Lexis 8330, at *20-21 (D.D.C. 2005). Judicial restraints often arise in the context of concerns about publicity prejudicing a defendant's right to a fair trial, and the Second Circuit examines whether the speech threatens the interest in a fair trial and whether the restriction is tailored to mitigate the potential harm. *Dow Jones*, 842 F.2d at 610-11. Analogized to that context, the no-deny provision should be upheld because permitting denials would threaten a compelling public interest in the enforcement of the securities laws and the "order has been narrowly drawn and is the least restrictive means available." *Brown*, 218 F.3d at 425.

### A. The government, and the judiciary, have a compelling interest in not permitting the denial of allegations following the entry of consent judgments.

Post-approval denials of allegations underlying a consent judgment threaten the public interest in the Commission's effective enforcement of the securities laws and the integrity and resources of the courts. A chief objective in settling via a consent judgment with a no-deny provision—as opposed to a "private" settlement that would not appear on the Court's docket—is that the allegations in the complaint serve as a public record of the Commission's investigation and its determination that a violation of the securities laws occurred. The allegations protect "the public by informing potential investors that a certain person has violated SEC rules in the past" and generally inform the public about the details of specific securities law violations. *Clifton*, 700 F.2d at 748. The allegations further serve a deterrent effect by "reminding defendants that they must obey the law in the future" and providing market participants with examples of what the Commission considers to be violative conduct. *Id.*; *cf. United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden

crimes of passion or opportunity, these crimes are prime candidate[s] for general deterrence.")
(internal quotation marks omitted; alteration in original).

If a settling defendant can deny the allegations in the complaint after consenting to a
judgment, these interests would be undermined.  It would create confusion about the allegations in
the complaint, which are resolved without a trial when the Commission cedes "the filing of findings
of fact and court opinions clearly setting forth the reasons for the result in a particular case." *Clifton*,
700 F.2d at 748.  It could also undermine confidence in the Commission's enforcement program by
creating an unfair impression that there was no factual or legal basis for the Commission's
enforcement action.

Romeril's request for relief strikes at the core of these interests.  He does not ask this Court
to vacate the consent judgment, return the parties to their pre-settlement positions, and proceed
with the litigation.  Rather, he wants to retain the benefits of the compromise—avoiding the costs of
trial, the risk of greater sanction,[3] and the collateral-estoppel effect of an adverse verdict—but then
pronounce, years after the fact, that there was no basis for the Commission's case against him.  Br.
at 20 (asking the Court to remove only the no-deny provision and reenter final judgment).  The
Commission would have little realistic opportunity to restart the litigation because, as a practical
matter, the passage of time has compromised the Commission's ability to try its case.  *Citigroup*, 752
F.3d at 295.  Romeril rhapsodizes about the "truth," Br. 13-14, which the Second Circuit rejected as
a basis for disapproving a consent judgment, *id.* at 297, but he chose to forgo his right to rebut the
Commission's allegations and even today does not seek an adversarial proceeding.

Permitting denials in this context would also undercut the authority of this Court, which
approved and entered the consent judgment.  *See Williams*, 720 F.2d at 920 ("Judicial approval of a

---

[3] Romeril agreed to pay $2.99 million in disgorgement and a $1 million penalty, Consent ¶ 2, but if
he went to trial, he could have faced a higher penalty equal to the "gross amount of pecuniary gain
to [him] as a result of the violation."  15 U.S.C. 78u(d)(3).

settlement agreement places the power and prestige of the court behind the compromise struck by the parties.").  "As part of its review [of a proposed consent judgment], the district court will necessarily establish that a factual basis exists for the proposed decree" and the equitable and remedial relief it imposes.  *Citigroup*, 752 F.3d at 295, 296-97.  Romeril's denial would create uncertainty as to the grounds for that assessment.  The need to avoid such uncertainty exists even long after the judgment has been entered because if defendants deny allegations against them in the wake of settlements, the public could be left with the impression that the resulting judgments are the product of an unfair process even though they are judicially supervised and mutually agreed upon.

A separate government interest implicated is that denials after settlement could alter the Commission's negotiating position and affect how it runs its enforcement program in ways that would impair the public interest in conserving judicial resources.  Settling by consent judgment allows the Commission to "manage risk" and obtain the best and most efficient result for the public interest.  *Citigroup*, 752 F.3d at 295.  The "numerous factors that affect" its decision whether "to compromise a case or litigate it to the end include the value of the particular proposed compromise, the perceived likelihood of obtaining a still better settlement, the prospects of coming out better, or worse, after a full trial, and the resources that would need to be expended in the attempt."  *Id.*

Proceeding to trial, and then a remedies hearing, is "costly" and takes time.  *SEC v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984).  The Commission determined here that the "optimal allocation of its limited resources" involved entering into a consent judgment with Romeril on the terms negotiated.  *Citigroup*, 673 F.3d at 165 (2d Cir. 2012); *Clifton*, 700 F.2d at 748 (describing the "balance of advantages and disadvantages" of settling).  Settlement allowed the Commission to obtain deterrent and remedial relief more quickly than it could through a trial, which accelerated the process of returning money to investors and permitted the Commission to pursue other investigations and enforcement actions.  *See* 15 U.S.C. 7246(a) (providing the Commission with

flexibility to distribute financial sanctions, including penalties, to injured investors); *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 82 (2d Cir. 2006) (describing the Commission's authority to return money to injured investors).  In this instance, the Court combined Romeril's monetary remedies with those obtained in the other Xerox-related settlements and distributed about $45 million to over 80,000 harmed investors.  Litig. Rel. No. 20471 (Feb. 29, 2008), https://www.sec.gov/litigation/litreleases/2008/lr20471.htm.

If the Commission cannot negotiate no-deny provisions, it may need to proceed to trial more frequently—particularly since many defendants will not admit to factual allegations because of the collateral estoppel effect of admissions on parallel private actions.  *Citigroup*, 673 F.3d at 161; *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331-32 (1979).  This would affect the Commission's ability "to conserve its own and judicial resources," *Clifton*, 700 F.2d at 748, and undercut the "strong federal policy" favoring the "approval and enforcement" of consent judgments.  *SEC v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991); *accord Evans v. Jeff D.*, 475 U.S. 717, 760 n.15 (1986) ("By lessening docket congestion, settlements make it possible for the judicial system to operate more efficiently and more fairly while affording plaintiffs an opportunity to obtain relief at an earlier time.").  The public benefits "from the saving of time and money that results from the voluntary settlement of litigation" because it reduces the burdens on the courts.  *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983); *In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 207 (3d Cir. 2003) (deferring to the "law's policy of encouraging settlement").  Settlement also allows for the Commission's efficient allocation of its resources.  *Board of Trade v. SEC*, 883 F.2d 525, 531 (7th Cir. 1989) ("Congress gives the [Commission] a budget, setting a cap on its personnel," which means that time spent on one case "means less time for something else."); *Randolph*, 736 F.2d at 529 ("The SEC's resources are limited, and that is why it often uses consent decrees as a means of enforcement.").

22

**B.  The no-deny provision is narrowly tailored to serve these important interests.**

Romeril disregards the plain language of the no-deny provision, which is narrowly tailored. He signed a consent because he valued the settlement over the ability to deny allegations.  His concerns about "informed public debate" and "self-examination" by a "healthy democratic republic" are overblown because the provision limits the speech of no one but Romeril.  As indicated by the citations in Romeril's brief, there has been no lack of public discourse about the Commission's settlement practices in recent years.  Br. 4, 9-12.

Contrary to Romeril's exaggerations, Br. 16-19, the no-deny provision is limited to one particular type of speech.  He agreed "not to take any action or to make or cause to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis."  Dkt. No. 4, Consent, ¶ 11.  Romeril can make private statements regarding the allegations without breaching the no-deny provision.  And so long as he does not deny the allegations in the complaint, he can: petition "appropriate government bodies" "to secure changes" in the Commission's "enforcement practices," Br. 18, Romeril Aff. ¶ 4; "speak, write and/or publish about [his] prosecution by the SEC," Romeril Aff. ¶ 4; attack Rule 202.5(e); and critique the Commission more generally.

The no-deny provision also contains an exception to allow denials in certain circumstances. The exception permits Romeril to "testify truthfully about any matter under oath in connection with a legal or administrative subpoena."  Dkt. No. 4, Consent ¶ 11.  And it preserves his "right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party."  *Id.*  When Romeril was named as a defendant in private securities-fraud actions, the no-deny provision did not stop him from denying allegations that he violated the securities laws.  *Carlson v. Xerox Corp.*, No. 00-cv-1621, Dkt. No. 438 (D. Conn. Nov. 9, 2007).

Despite having leveraged this exception to his advantage, Romeril now portrays it as a flaw. Br. 13-14. The exception is not "self-favoring" for the Commission. Defendants, like Romeril, often insist on this language in order to be able to make denials in related private actions, particularly securities-fraud class actions. *See Citigroup*, 673 F.3d at 161, 165 (requiring admissions "would in most cases undermine any chance for compromise"). The exception benefits Romeril, not the Commission. And the fact that the exception to the no-deny provision allows for *more* speech, not less, does not undermine its constitutionality. *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1668 (2015) (declining to strike down a law for "abridging *too little* speech" because the Court has "upheld laws— even under strict scrutiny—that conceivably could have restricted even greater amounts of speech in service of their stated interests").

The remedy for a breach also underscores the no-deny provision's tailoring. Contrary to Romeril's description of the provision as exposing him to punishment or additional prosecution, Br. 4, 7, if Romeril publicly denies the allegations in the complaint, the relief available to the Commission, under the terms the parties negotiated, is the option to seek to vacate the consent judgment, which would return the parties to their original negotiating positions. Dkt. No. 4, Consent, ¶ 11. Thus, if Romeril breaches the no-deny provision, he will face the *possibility* of losing the benefit of the bargain and going to trial where he can further deny the allegations.

Romeril misreads the provision by contending that it gives the Commission "unbridled enforcement discretion" to reopen the case. Br. 7. In the event of a breach, the Commission has the option of *moving* to vacate the consent judgment, but this Court would decide whether to grant that relief. The Commission has discretion only as to the decision whether to move for relief— Romeril would lose the settlement only if this Court agreed to restore the case to the active docket.

Finally, Romeril's criticism of the provision as "unconstitutionally vague" is misplaced. Br. 15-16. While the provision binding the Commission and Romeril is not a statute (or regulation) of

general applicability, "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008).  The relevant "fact" here is easy to discern—Romeril cannot deny the allegations in the complaint or create an impression that it lacks a factual basis.  *Id.*  This "language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 187 (2d Cir. 2010).  While the precise language that may trigger the provision could vary, "the mere fact that close cases can be envisioned does not render a statute vague."  *Id.* at 305; *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) ("Condemned to the use of words, we can never expect mathematical certainty from our language.").

## CONCLUSION

The motion for relief from judgment should be denied.

Dated:  June 18, 2019

SECURITIES AND EXCHANGE COMMISSION

By */s/  Matthew S. Ferguson*

MATTHEW S. FERGUSON
Senior Counsel
JEFFREY A. BERGER
Senior Litigation Counsel
U.S. Securities and Exchange Commission
Office of the General Counsel

DAVID J. GOTTESMAN
Deputy Chief Litigation Counsel
U.S. Securities and Exchange Commission
Division of Enforcement

100 F Street NE
Washington, DC 20549
FergusonMA@sec.gov
202-551-3840 (Ferguson)
Fax: 202-772-9263

## CERTIFICATE OF SERVICE

I certify that on this 18th day of June, 2019, I have served a copy of Plaintiff's foregoing Memorandum in Opposition to Motion for Relief from Judgment on all counsel of record through the Court's CM/ECF system.

*/s/  Matthew S. Ferguson*

Matthew S. Ferguson